WILLIAM WHITAM v. THE DUBUQUE & SIOUX CITY RAILWAY COMPANY, Appellant.

ELEMENTS OF CONTRACT: PRINCIPAL AND AGENT—OFFERED INSTRUCTION, ESTOPS COMPLAINT THAT ONE LIKE IT SHOULD NOT HAVE BEEN GIVEN.

*Appeal from Hamilton District Court.*—HON. D. R. HINDMAN, Judge.

SATURDAY, DECEMBER 14, 1895.

Plaintiff stated as his cause of action that on or about the ——day of May, 1889, he entered into a verbal contract with the defendant for the erection of one hundred and fifty miles in length of fence on the line of its road between Fort Dodge and Waterloo and from Waterloo to Lyle, he to furnish all tools and men necessary to do the work, and defendant to furnish all material, said work to be commenced by the fifteenth of June, 1889, and completed before January 1, 1890; that plaintiff was to receive therefor thirteen cents per post or panel; that plaintiff purchased a large number of tools, employed and boarded men, and incurred other expenses, preparatory to commencing said work, and was fully prepared and equipped, and ready to perform said contract; that the defendant, without cause or justification, refused him said contract, and would not allow him to go to work on the same; that he used efforts to obtain other employment during the season of 1889, but was unable to make the loss good; that by reason of the refusal of the defendant to fulfill said contract he is damaged in the sum of three thousand dollars which he asks to recover. The defendant answered, denying each and every of said allegations, and alleging in substance as follows: That about the twentieth of June, 1889, the defendant offered to enter into a contract with plaintiff for said work, or any part thereof, and that afterward, on the ninth day of July, 1889, the plaintiff entered into a contract in writing with the defendant to do a certain part of said work, namely, from Waterloo to Lyle;

wherefore plaintiff is estopped from maintaining this action. Defendant denies that any other than said written contract was ever entered into. The case was tried to a jury, and a verdict and judgment for five hundred dollars rendered in favor of the plaintiff. Defendant appeals.—*Reversed.*

*John F. Duncombe* and *Hyatt & Hyat.* for appellant.

*Wesley Martin* and *D. C. Chase* for appellee.

Given, C. J.—I. The questions presented by appellant were saved by exceptions to rulings upon defendant's motion for a verdict and motion for a new trial. Appellee, to establish the alleged verbal contract, introduced evidence of certain conversations and transactions between himself and one John Holden, an employe of appellant, who it is claimed had authority from appellant to make the alleged contract. Appellant contends that there is no evidence that a contract was made, as alleged, and no evidence that Holden had authority from appellant to make such a contract, and that, therefore, the court erred in overruling defendant's motion for a verdict, and also in overruling defendant's motion for a new trial.

We first inquire whether there is evidence tending to show that the alleged verbal contract was made. Appellee testifies upon that subject in substance as follows: That on May 28, 1889, he was at Cherokee, engaged in building a fence for defendant around a sand pit, when he received from Holden a telegram, asking him to meet him next day; that he met Holden, when the following conversation occurred:

"He says: 'Did you get my note?' I says: 'Yes.' 'Now,' he says, 'Whitman, the big job is come on. Mr. Jacobs sent me here after you, for fear you would take a contract west.' 'Well,' I says, 'Mr. Holden, Sullivan and me is figuring on it now.' 'Well,' he says, 'it is no more than right that you should fence our division, because we have got you to work these last six or seven years past over this line, both east and west, and it is no more than right that you should work for us.' Says I: 'Mr. Holden, I would sooner work under you, in order that, when I want material under you, I can always get it, and out west here they are very slack about getting a man material.' Says I: 'How many miles have you got for me?' Says he: 'We have got one hundred and fifty for you. Can you do it this season?' 'This season? I can.' 'Come in here as quick as possible, and get ready, as I want you to commence as soon as the tenth—not later than the fifteenth—of June, 1889.' Says he: 'How many men will you start with?' Says I: 'I will start with twenty, and will run for a week, and I will figure up at the end of the week, and, if I ain't going fast enough, I will put on ten more, and run a thirty-handed gang.' 'How many hand

cars will you want to start with?' Says I: 'I will start with two.' Says he: 'Your own hand car is at Pat Sullivan's, at Webster City, ain't it?' Says I: Yes; it was there when I left.' Says he: 'It is there now, and I will have another one put in by the time you are ready.' That was about all that was said at that time between me and Mr. Holden." Witness afterward stated that Holden said that the one hundred and fifty miles would be from Ft. Dodge to Waterloo, and by the branch to Lyle. Concede that John Holden had authority from appellant to contract for this fence, and we think that there was in this evidence such a showing of the contract alleged as that issue was properly submitted to the jury. It is true the contract as stated by appellee is lacking in many of the details that are usually found in a contract of such importance, but this is explained somewhat by the relations of the parties, as will hereafter apear.

Upon the issue as to Holden's authority, there is no direct evidence that he had authority from the appellant to make contracts like the one alleged, but, on the contrary, we have the undisputed evidence of several of appellant's officers, who were in position to know, that Holden did not have such authority. We do not understand appellee to claim that he has shown general authority to Holden to make such contracts, nor express authority to make the contract alleged. Such a claim would, we think, be without support in the evidence. His claim is, though not so alleged, that the defendant held Holden out as having the authority, that appellee had a right to, and did, believe that Holden had the authority, and that, after the contract was made, the defendant recognized and ratified it. These contentions will be better understood by first noticing the relations of the parties. Prior to October, 1888, this line of railway was operated by the Illinois Central Railway Company, of which Holden was an employe for many years in the capacity of road supervisor over the line from a little west of Cedar Falls to Ft Dodge. His duties were to supervise the repairing of tracks on his own sections only, and he had nothing to do with any other part of the road. During the six or seven years preceding October, 1888, the plaintiff had done the work of building and repairing right of way fences for the Illinois Central Railway Company at various points along the line, sometimes constructing continuous lines of fences from one to five miles in length. There is evidence tending to show that some of this work was done at the instance of Holden and of other supervisors, and generally without any written contract. Holden continued to occupy the same position after the road came into the possesion and control of appellant, and appellee, as we have seen, was engaged in building a fence for appellant around a sand pit at Cherokee at the time it is claimed this verbal contract was made. It is probably true that, because of these relations, appellee believed that Holden had authority to make the alleged contract

on behalf of this apellant. Appellant, no doubt, had in contemplation in June, 1888, the erection of these one hundred and fifty miles of fence in compliance with the recently enacted statute in regard to fencing railroad rights of way. The evidence shows without contradiction that when fences were to be built, the order would originate from appellant's general manager who would instruct the superintendent, and he, in turn, the road master, who would intrust supervision of it to the road supervisors, within their respective sections. The only evidence that Holden had any authority from his superior is the statement of appellee that Holden said: "Mr. Jacobs sent me here after you, for fear you would take the contract west." Mr. Jacobs was appellant's road master, The court instructed to the effect that the manner in which business had been done prior to the time that appellant became the owner of the road (October, 1888) should not be considered "in determining the liability of the defendant to the plaintiff." No complaint is made of this instruction. It is therefore the law of the case, and takes out of it any inference that might arise as to Holden's authority, because of the manner in which appellee had dealt with the agents of the Illinois Central Railway Company.

As already stated, there is no evidence of any express authority to Holden to make this contract, but, on the contrary, that he had no such authority. His statement that Jacobs had sent him after the plaintiff was not even an assertion of authority to make this contract, nor could the authority be established by the declarations of Holden alone. We think it is clear that there is an entire absence of evidence to show that Holden had authority to make a contract such as that alleged.

The facts relied upon by appellee as constituting a ratification of the contract by appellant are these: Appellee says the defendant recognized the contract by sending cars to Webster City for plaintiff's use; that the company issued an employe's pass to the plaintiff, and allowed plaintiff to hire men and buy tools for the work, instead of disaffirming the contract within a reasonable time. We do not find that any cars were sent to Webster City other than the one that the plaintiff already had, and the employes' passes issued to the plaintiff have no necessary reference to this contract, but are rather referable to the prior and subsequent employment of the plaintiff, as will hereafter appear. Holden sent him a time card June 10, 1889, with a caution not to get his cars run into, but this is explained by plaintiff's being then employed at the sand pit at Cherokee.

We discover no evidence whatever of any ratification by the appellant. On the contrary, it appears that appellant's agents at all times denied the contract, and the authority of Holden to make it, and that interviews with plaintiff on the subject resulted in appellant's offering to give him a contract for one hundred and fifty miles of fence, upon certain conditions as to price, etc., which,

he declined. Their negotiations resulted in a written contract being entered into between the plaintiff and M. Gilleas, superintendent of appellant's company, whereby plaintiff was to erect what right of way fence was required to inclose the road between Cedar Falls Junction and Nashua. This contract both parties fully performed. Appellee contends that he entered into this contract to lessen the damages that resulted to him from the refusal of the appellant to allow him to construct the one hundred and fifty miles of fence. We think there is an entire absence of evidence to show that appellant accepted or ratified the alleged verbal contract, and that this subsequent contract in writing was entered into with the knowledge, on the part of the plaintiff, that the defendant had at all times denied the authority of Holden to have made the verbal contract, or that it was liable therefor. There being no evidence of authority in Holden to make the contract, nor of a ratification thereof by the appellant, we think the court erred in not sustaining the appellant's motion for a verdict and the motion for a new trial.

II. Appellant's further contention is that the verdict is "in express opposition to the charge of the court." This position we think is well taken, in view of the evidence. It is difficult to see how, under the instructions, the jury could have found that Holden had authority to make the contract, or that the defendant had ratified it.

Some complaint is made of the instructions given. It is complained that the court erred in submitting the question of ratification, because there was no allegation to that effect. It is true plaintiff did not allege ratification, but appellant asked three instructions, in the first of which the question of ratification is asked to be submitted. True this instruction was refused, but the appellant should not complain that that feature of it was embraced in instructions given by the court. The other objections taken to instructions seem to us to be without merit, and are therefore not further noticed.

For the reasons stated, we conclude that the judgment of the district court must be *reversed*.